## Thomas v. McBeth's Administrator et al.

(Decided May 21, 1935.)

.ADOLPH GRAVES and WM. W. MEEKS for appellant.

JOHN S. DEERING, R. L. BRONAUGH and G. ALLISON HOLLAND for appellees.

OPINION OF THE COURT BY JUDGE RATLIFF—Reversing.

Sarah McBeth, a colored woman, died without issue and intestate, a resident of Jessamine county, Ky., in the month of October, 1932. She left surviving her her husband, George McBeth, who qualified as administrator of her estate, and thereafter in the month of April, 1933, George died. Thereafter the appellee Glen Ricketts was appointed administrator de bonis non of the estate of the decedent.

At the time of the death of the decedent, she was the owner of about 36 acres of land in Jessamine county and also some personal property. She heired about 16 acres of this land from her father, John Caldwell, who died in the year 1920, and acquired the remainder of the land from other sources.

Ricketts, as administrator de bonis non of the estate (hereinafter called the appellee), filed this suit in the Jessamine circuit court for the purpose of having the real estate owned by the decedent sold for the payment of her debts and for settlement of his accounts as administrator. He named as party defendants the creditors of the estate, and the descendants of two deceased brothers of decedent as her heirs at law.

Thereafter the appellant filed her intervening petition, setting up her claim to the property of the decedent. She claimed that she was entitled to one-half of the property as an heir of her deceased father, John Caldwell, and the remainder, on the grounds that she was a half-sister and next of kin of the decedent, Sarah McBeth. As a basis for her claim, she alleged that she was the child of John Caldwell and was the issue of a

slave marriage between John Caldwell and her mother, Mariah Caldwell, during slavery in the state of Kentucky, and prior to the marriage of John Caldwell and Rebecca Caldwell, the mother of decedent.

Her claim was resisted by the administrator, and by subsequent pleadings the issues were made and the cause referred to the master commissioner, who took proof and made his report to the circuit court, reporting that appellant was not the child of John Caldwell as result of the alleged customary marriage and was not entitled to inherit as an heir of John Caldwell. Exceptions to the commissioner's report were filed by appellant, which were overruled, and the court entered an order confirming the report and dismissing appellant's intervening petition, and from that order appellant has brought this appeal.

Appellant's case is founded on sections 1399a of the Kentucky Statutes, an act of 1898, and a prior statute with reference to slave marriages, which is known as the act of 1866. Section 1399a reads:

"That in all cases where, during the time of slavery in Kentucky, any male and female colored persons lived together and cohabited with each other as husband and wife to each other, and any child or children was the result of such cohabitation, such child or children shall be held to be the lawful child or children and legal heirs of both the father and mother in all cases where the father or mother shall die or shall have died the owner or owners of any real or personal property, and legally entitled to inherit such property of both father and mother: Provided, That in cases where such father or mother subsequently intermarried by license, with some other colored person, and a child or children resulted from such marriage by license, then and in all such cases the children resulting from the slave marriages shall only be entitled to inherit such proportions of the property of their father or mother as the number of children resulting from slave marriages bears to the number of children resulting from the subsequent marriage by license; And provided further, That this act shall not apply in any case where the property of either father or mother has passed to innocent purchasers or heretofore

divided out or sold, or distributed by the order or judgment of any court of competent jurisdiction."

Section 2 of the Acts of 1866 reads as follows:

"All negroes and mulattoes who have heretofore lived and cohabited, and do now live together as husband and wife, shall be taken and held in law as legally married, and the issue held as legitimate for all purposes; provided, such persons shall appear before the county court of their then residence and declare they have been and desire to continue living together as husband and wife, when, upon the receipt of a fee of 50c, the clerk shall make a record of such declaration and for an additional fee of 25c, the clerk shall furnish the parties with a certificate of said declaration: Said record or certificate shall be evidence of the existence of the marriage and the legitimacy of the issue born or to be born to said parties, provided, the issue of customary marriages of negroes shall be held legitimate."

From a reading of the statutes quoted above (and various opinions of this court construing same), it will be seen that the question here to be determined is one of proof. If appellant's proof is sufficient to sustain her allegations that she was born of a customary marriage or a slave marriage, entered into between her alleged father, John Caldwell, and her mother, during the time of slavery in Kentucky, she is entitled to inherit as an heir of John Caldwell.

The argument for appellee is that even though John Caldwell was the father of appellant, yet she was not the issue of a customary slave marriage as contemplated by the statute, but, on the other hand, was simply a bastard in the ordinary meaning of the term. The further argument is that at the time appellant was begotten and born John Caldwell was then living with his wife, Rebecca Caldwell. There appears in the record a marriage certificate copied from an old Bible found in the home occupied by the decedent, Sarah McBeth, purporting to show that John Caldwell married Rebecca Watson Caldwell, of Woodford county, on the 28th day of December, 1864. It is also shown by the records of the Woodford county court that in April, 1875, John Caldwell and Rebecca Caldwell appeared before the clerk of

Woodford county court and declared that they had lived together as husband and wife for the past 11 years and still desired to continue such relations. The date of this certificate corresponds to the marriage certificate above mentioned, date in 1864. It is evident from the records that John Caldwell was living with Rebecca Caldwell as his wife, according to the customary slave marriages, as early as 1864. But it is also shown that appellant was born in 1862, two years previous to his alleged marriage to Rebecca, the mother of the decedent, Sarah McBeth.

Appellant testified that she was born in 1862 in Woodford county, Ky., on what was known as the Kirby farm; that she attended school in Woodford county and was placed in the school by her father, John Caldwell, and during that time she lived with her father and mother. Counsel for appellee insists that this testimony is inconsistent in that if she was born in 1862 and her father married Rebecca in 1864, she was not of school age previous to her father's marriage to Rebecca. After telling about attending school in Woodford county, she was asked this question: "During that period of time you lived with your mother and father? A. Yes Sir." It is not clear whether she meant to say that she was in school at the time referred to, before her father and mother separated, or whether she meant to say that she was living with her mother at that time. She had just previously stated that her father put her in school in Woodford county. However, at the most we do not conceive that this could have a very material bearing on her evidence. She further testified that after she and her mother moved to Lexington, her father visited them and brought them vegetables, and occasionally gave her money. She testified that she did not visit her father and Rebecca, his last wife, because "she was cool toward me and I didn't care to be about her." She further testified that, after her father married Rebecca, he frequently came to see her and provided for her.

Appellant's evidence, which is undisputed, conduces to show that John Caldwell recognized her as his daughter, but of course she knew nothing about her father's and mother's alleged customary slave marriage or living together previous to her birth. Appellant's daughter, Lilian Thomas Courtney, testified to visits made by

Caldwell to the home of her mother and said that he called her mother "daughter." Jessie Bates testified that John Caldwell frequently told her that the appellant was his daughter and Mariah was her mother. She further testified as to his treatment and attitude toward appellant, indicating affections for her and recognizing her as his daughter. Handy Bates, a nephew of Caldwell, testified that he had frequently talked to Caldwell about Sally, the appellant, and that John frequently told him that Sally was his daughter. Lafe Ashford, a colored man 79 years of age, testified that he knew appellant's mother, Mariah Caldwell, who also went by the name of Mariah Hawkins, and that Mariah and John Caldwell lived together "in the early days," and he remembered Sally (appellant) was born during the war, and that her father and mother lived together. He also testified that he remembered the marriage of John Caldwell and Rebecca, his last wife. He said:

"They married on the back porch in the lower end of the yard—now I don't remember whether the war was going on or not.

"Q. How long had he been keeping company with Rebecca? A. I don't know.

"Q. Do you know how many years he went with her? A. No, sir, I was too small to pay any attention to that.

"Q. Do you know who else he went with? A. Mariah Hawkins; (meaning mother of appellant). She came down on Saturday night and created a big disturbance about him being there."

He further said that this occurrence was after appellant was born. Mose Watkins, a colored man, testified that he was 69 years old and said that appellant's mother was raised by his mother and appellant's father was said to be John Caldwell, and that appellant was known as Sally Caldwell when she went to school.

The testimony of the above witnesses conduces to show that John Caldwell recognized appellant as a daughter, but it has but little bearing on the question as to whether he and her mother had lived together as man and wife so as to establish a customary slave marriage, except the evidence of Lafe Ashford, who testified that appellant's mother and Caldwell lived to-

gether "in the early days," and as he remembered appellant was born during the war and that Caldwell and her mother were living together. But we have the testimony of Preston Thomas, a white man 79 years of age at the time he testified, who lived in the Woodford County Infirmary. He testified that he first knew John Caldwell when he came to the place of the witness's brother-in-law, about one-fourth of a mile from the home of the witness; that he knew Mariah Caldwell, appellant's mother, and that she was owned by his brother-in-law, Alex Kirby, who had purchased Mariah from Tom Hawkins. He stated that John Caldwell and Mariah lived together on his brother-in-law's place, and that appellant is the child of John Caldwell and was born in his brother-in-law's yard, and that John Caldwell and Mariah were living together at that time, and continued to live together after the birth of appellant, but he was unable to state just how long. He said that appellant was considered the child of John Caldwell and Mariah Caldwell, who lived together as husband and wife during slavery, and continued to live together until "they all scattered and left the home," and that appellant was born during the Civil War.

It appears to us that the testimony of Preston Thomas and Lafe Ashford is sufficient to establish appellant's claim that John Caldwell and her mother lived together as husband and wife during the days of slavery. Their evidence is abundantly corroborated by the evidence of the various other witnesses, as indicated above, to the effect that John Caldwell had always recognized appellant as his daughter.

Appellant's testimony is not directly contradicted. Martha Bates, one of the opposing claimants of the property in question, testified that it was rumored by the "old settlers" that one John White was reputed to be the father of appellant. She said that John Caldwell was a huckster or peddler and frequently made trips to Lexington, but she had never heard of him taking any provisions to appellant or visiting her, and further said that she had never associated with appellant and was never around her. George F. Froman, a white man, testified that he knew John Caldwell and remembered when he married Rebecca, but he knew nothing about a woman named Mariah and had never heard John Caldwell say anything about her. However, the witness

further stated that he knew nothing about John Caldwell during the war, and only knew him afterwards. It will be seen that this witness knew nothing about whether or not Caldwell and appellant's mother lived together as husband and wife during the war according to the marriage customs among slaves. Joe Bolar, a colored man who was born in 1852, testified that he knew John Caldwell when he was a young man and saw him coming to dances, and he saw him occasionally around the end of the war, but was never well acquainted with him until after the war. He further said that he never heard Caldwell make any mention of a woman named Mariah, but that he never talked to him about his family. Other witnesses gave similar testimony in effect that they knew Caldwell, but they did not know whether or not he ever lived with appellant's mother.

It will be seen that the witnesses for appellee did not directly contradict the witnesses for appellant. All their testimony shows is that they did not know whether or not Caldwell and appellant's mother lived together as husband and wife. They merely say that they did not hear Caldwell make any statements indicating that he lived with appellant's mother or that appellant was his daughter; and practically all of them admitted that they were not in a position to know whether or not Caldwell and appellant's mother had lived together.

The further argument is that there can be no customary marriage unless the parties declare their intention to live together as man and wife until they are separated by death or some other unavoidable casualty, and a record of such intention made in the county clerk's office as provided in the statutes, supra, and to support this argument the case of Estill v. Rogers, 1 Bush (64 Ky.) 62, is relied on. That case does not deal with the question here in issue. It only holds that the surviving man or woman of a customary slave marriage is not entitled to letters of administration of the deceased one, in preference to the next of kin of the deceased. The statutes relied on in the present case deal only with the issue of customary marriages of slaves with respect to the right of such issue to inherit from their putative father. It does not deal with the question of preference of letters of administration.

With respect to the competency and nature of the

evidence of appellant and her witnesses and the law of the case, we may cite the case of Lindsey's Devisee v. Smith, 131 Ky. 176, 114 S. W. 779. The facts of that case and the evidence are very similar to those in the present case. See, also, to the same effect Williams v. Williams, 226 Ky. 13, 10 S. W. (2d) 477, 479.

The order dismissing appellant's petition does not show upon what grounds the chancellor based his conclusion, i. e., whether it was a conclusion of law, or for lack of sufficient evidence to sustain appellant's claim. It is our conclusion, however, that appellant's claim is sustained by both the law and the evidence. We are not unmindful of the rule that where the evidence is so close and doubtful as to leave the truth in doubt, this court will not disturb the finding of a chancellor. But it is also the rule that we will weigh and judge the sufficiency of the evidence for ourselves, and when it is found to preponderate for one side or the other in such way as to convince us that the chancellor erred, his judgment will be reversed. Faulkner v. Headrick's Adm'r, 213 Ky. 692, 281 S. W. 813.

It is our conclusion, therefore, that the great weight and preponderance of the evidence is in favor of appellant and is amply sufficient to sustain her claim. The record discloses that appellant's mother had other children, and it is contended for appellee that these others are entitled to inherit if appellant is. As to what part of the estate appellant is entitled to, we express no opinion, as that question is not fully developed and is not before us. Suffice it to say that she is entitled to such share of John Caldwell's estate as provided in section 1399a of the statutes.

For reasons indicated, the judgment is reversed, and remanded for proceedings consistent with this opinion.